Phyllis HOWARD, Appellant,

v.

The RIGGS NATIONAL BANK, Appellee.

No. 79–1108.

District of Columbia Court of Appeals.

Argued April 17, 1980.
Decided May 27, 1981.
As Amended July 14, 1981.

<hr>

2. *Spencer v. Board of Zoning Appeals*, 141 Conn. 155, 104 A.2d 373 (1954).

3. *Id.* at 157, 104 A.2d at 375.

Leonard S. Rubenstein, Alexandria, Va., for appellant. Janis L. McDonald, Alexandria, Va., also entered an appearance for appellant.

Frank F. Roberson, Washington, D. C., with whom Wendy T. Kirby, Washington, D. C., was on the brief, for appellee.

Before KELLY, NEBEKER and HARRIS, Associate Judges.

HARRIS, Associate Judge:

Appellant brought suit in the Superior Court charging appellee The Riggs National Bank (Riggs) with (1) common-law fraudulent misrepresentation, and (2) alleged violations of the District of Columbia Consumer Protection Procedures Act, D.C.Code 1978 Supp., Title 28 App., § 5. Appellant challenges the trial court's grant of summary judgment in favor of Riggs. We affirm.

I

Viewed in the light most favorable to appellant, the record reveals the following facts.[1]

In early April of 1978, appellant contacted Louise Kelly, then a loan officer at the Watergate branch of Riggs, to apply for a mortgage loan. Appellant told Kelly that she needed approximately $53,000 to purchase and renovate a house located in northwest Washington.

Kelly indicated that before a construction loan could be made, the bank would need to see plans and specifications for the proposed renovation. When appellant expressed concern at the expense of retaining an architect to draft plans prior to her procuring the loan, Kelly commented that she knew of a contractor that could both draw up the plans and do the construction work at a reasonable price. Kelly men-

---

1. In reviewing a grant of summary judgment, we must view the facts in the light most favorable to the party against whom the judgment was directed. We also must give that party the benefit of all reasonable inferences from those facts. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Willis v. Cheek*, D.C.App., 387 A.2d 716, 719 (1978). In light of these rules we note, with respect to the Riggs' employees involved in this case, that the preponderance of the evidence on the record (as reflected by the various witnesses' depositions and affidavits) does not necessarily support all of the facts as they are set forth below.

tioned that this contractor, Corio Corporation (Corio), had performed renovations for several of Riggs' customers, and that in one instance Corio had done the work for $10,000 less than any other construction firm had bid. Kelly also said that she had seen some of Corio's work and that it was "very good ... very beautiful." She then gave a loan application form and Corio's telephone number to appellant, and asked appellant to return after she had obtained an estimate for the proposed construction work.[2] Kelly did not mention to appellant that she (Kelly) was a personal acquaintance and former co-worker of Glenna Cortinas, the wife of one of Corio's co-owners, Antonio Cortinas, Jr.

On April 13, appellant met with Antonio Cortinas and Andrew Ciaccio, the other co-owner of Corio, at the house which she intended to purchase. At the time, Cortinas and Ciaccio informed appellant that they would need an $8,000 deposit before they could give her an estimate. The next day, a Friday, appellant attempted to reach Kelly at the bank to inquire about the advisability of paying the deposit, but she was told that Kelly was out of town. Appellant then decided to go ahead and sign a contract with Corio, paid Corio the $8,000 deposit, and received an itemized estimate for the proposed renovation work.[3] Appellant did not contact any other prospective contractors. The following Monday, appellant telephoned Kelly at Riggs and told her that she had signed the contract and had paid the deposit. Kelly replied, "That's okay. Do you have the estimate?" Appellant answered that she did, whereupon Kelly asked

her to bring it to the bank so that the loan application could be processed.

After Kelly had received the pertinent information, she forwarded the application to John Kline, an assistant vice-president of Riggs in the bank's real estate loan department. Approximately one month later, Kline informed appellant by phone that the bank tentatively had decided to make her a loan, but that the bank did not feel her financial status justified lending her the full amount she had requested. He offered her a loan of $40,000, which she accepted. On May 17, Kline sent appellant a letter conforming her acceptance of the loan and listing the terms and conditions of the loan agreement. The letter stated that the loan commitment was subject to the bank's approval of a general contractor who could provide a completion bond of a recognized surety company. It also required submission of plans and specifications for the renovation work and copies of the building permits. Appellant then arranged a meeting with Kline. At that meeting to which Ciaccio accompanied appellant, Kline explained that $31,500 of the loan would be paid at settlement, and the remaining $8,500 would be disbursed upon completion of the renovation. Kline then asked Ciaccio for Corio's certificate of bonding. Ciacco replied that he had left it back at his office. Ciaccio gave Kline the name of the bonding company and said that he would deliver the certificate the next day.

About a week later, appellant telephoned Kline to see whether he had received Corio's bonding certificate. She was told that no certificate would be needed after all, and

**2.** Appellant's deposition presents inconsistent versions of exactly what Kelly told appellant she was required to do before the loan application could be processed. It appears that appellant initially understood that she would have to procure a complete set of plans and specifications for the proposed construction work before the application could be submitted. As it turned out, however, all Kelly required at first was a contractor's estimate of the renovation costs. (As noted *infra*, the bank informed appellant after the loan tentatively had been approved that the contractor would have to provide the plans and specifications, along with a

completion bond, before any money would be disbursed.)

**3.** After setting forth a list of proposed renovation items, the contract provided that:

We [Corio] hereby proposed to furnish labor and materials complete in accordance with the above specifications for the sum of $29,500 with payment to be made as follows: Deposit of $8,000, interim payment of $10,000, balance upon completion.

The contract also stated that "[i]f there is any problem with financing, we will return the deposit."

that she should go ahead and arrange a settlement date. Although Kline did not explain the reasons for this change to her, the record reflects that the bank had decided to offer appellant a conventional mortgage loan rather than a construction mortgage loan. This was done because appellant had indicated that she would need more money "up front" at settlement than would be forthcoming under a construction loan.[4] Moreover, Riggs had determined that, even without any renovations, the value of the property involved was greater than the amount of the loan, thus negating any need for a certificate of bonding.

In the latter part of May, still prior to settlement, Cortinas and Ciaccio told appellant that they had purchased the necessary materials and that they wanted to begin work immediately after settlement. They asked her, however, to modify their contract so as to provide for an additional payment of $8,000 prior to the commencement of any construction work. As consideration, they offered to lower the total price for the renovations by $500. Appellant agreed, and and in the latter part of May she signed a new contract. Settlement on the real estate transaction took place on June 16.

Shortly after settlement, Corio entered the property and began removing various fixtures, the ceiling, and woodwork. That, unfortunately, was the total extent of the work performed on the contract by Corio. When it became apparent that Corio was not going to perform, appellant—with Louise Kelly's assistance—tracked down Cortinas and Ciaccio, who told her that they were running low on money because of some "bad deals," but that they would com-

plete the job for $25,000 if the entire balance were paid in advance. That proposition quite understandably was unattractive to appellant at that point, so she sought the aid of the Office of Consumer Protection (OCP).[5] Through the OCP, appellant obtained an agreement from Corio that it would pay her back the $16,000 which she had advanced to it. However, only $400 was returned. Sometime after appellant filed her law suit, Cortinas filed for bankruptcy. The record does not reveal what happened to the Corio Corporation.

In the trial court, appellant alleged that Riggs, through its employees Kelly and Kline, made material misrepresentations and withheld material information concerning Corio which tended to induce her reliance thereon to her detriment. Specifically, she complained that Kelly made representations concerning Corio's reputation and the quality of Corio's work which were misleading and in reckless disregard of the truth. Appellant also pointed to Kelly's failure to disclose her acquaintance with Antonio Cortinas' wife, and to her failure to disclose the fact that Cortinas had defaulted on a loan from Riggs several weeks before appellant first spoke with Kelly.[6] Finally, appellant asserted that Kline had led her to believe that Corio was "fully legitimate and bonded," when in fact it was not. The trial court concluded that no cause of action lay under either a common-law theory of fraudulent misrepresentation or the Consumer Protection Procedures Act. Accordingly, the court granted summary judgment in favor of Riggs.

## II

It is axiomatic that summary judgment is an extreme remedy which is

---

4. Under a construction mortgage loan, the bank disburses funds gradually as construction progresses. With a conventional mortgage loan, all or a substantial part of the loan is paid out at settlement.

5. Although the record repeatedly refers to the Office of Consumer Affairs, that office was abolished and was replaced by the Office of Consumer Protection in 1976 pursuant to the Consumer Protection Procedures Act. *See* D.C.Code 1978 Supp., Title 28 App., § 3(f).

6. It is undisputed, however, that Kelly had no knowledge of Cortinas' default on the loan at the time she was dealing with appellant. Even if she had been aware of it, though, it is doubtful that her failure to disclose that information to appellant could be considered a "material" omission, since the loan had been a personal one to Cortinas rather than one to Corio Corporation.

appropriate only when the moving party is clearly entitled to judgment as a matter of law. *See, e. g., Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944); *Willis v. Cheek,* D.C.App., 387 A.2d 716, 719 (1978). The movant in such a case must bear the burden of proving that no genuine issue of material fact exists. Moreover, all inferences which may be drawn from subsidiary facts are to be resolved against him. *See e. g., Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Willis v. Cheek, supra,* at 719.

We conclude that although there are disputes as to subsidiary facts, no genuine dispute as to material facts sufficient to bar summary judgment exists. Even under appellant's version of the events leading to this lawsuit, the facts support the ruling in favor of Riggs as a matter of law. *See,* Super.Ct.Civ.R. 56(c).

### III

 The tort of fraudulent misrepresentation has four essential elements: (1) a false representation or willful omission of a material fact; (2) knowledge of the falsity; (3) an intention to induce reliance; and (4) action taken in reliance on the representation. *Jacobs v. District Unemployment Compensation Board,* D.C.App., 382 A.2d 282, 286 & n.4 (1978); *Rosenberg v. Howle,* D.C.Mun.App., 56 A.2d 709, 710 (1948); *see Bennett v. Kiggins,* D.C.App., 377 A.2d 57, 59 (1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978); W. Prosser, The Law of Torts § 105 (4th ed. 1971) (listing a fifth element, damages resulting from the action taken in reliance on the representation). To prevail at trial, a plaintiff must establish these requisite elements. *Bennett v. Kiggins, supra,* at 59–60. In our jurisdiction, the second element of fraudulent misrepresentation—knowledge of the falsity—may be satisfied by showing that the statements were "recklessly and positively made without knowledge of [their] truth." *McNabb v. Thomas,* 88 U.S.App.

D.C. 379, 380 n.1, 190 F.2d 608, 609 n.1 (1951); *see also Spargnapani v. Wright,* D.C.Mun.App., 110 A.2d 82, 83–84 (1954).

 Appellant's allegations, insofar as they are supported by any evidence in the record, fall far short of establishing the necessary elements of this tort. At most, appellant has demonstrated that she detrimentally relied (albeit without justification for so relying) upon Kelly's suggestion that appellant contract with Corio Corporation to perform the desired remodeling work and upon Kelly's expression of opinion that Corio's performance would prove satisfactory. Opinions or predictions of future events do not constitute representations of material fact upon which a plaintiff successfully may place dispositive reliance. *See Day v. Avery,* 179 U.S.App.D.C. 63, 70–71, 548 F.2d 1018, 1025–26 (1976), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d 394 (1977); W. Prosser, *supra,* § 109. In *Bennett v. Kiggins, supra,* 377 A.2d at 61, we said:

> When a person positively states that something is to be done or is to occur, when he knows the contrary to be true, the statement will support an action in fraud. On the other hand, a prophecy or prediction of something which it is merely hoped or expected will occur in the future is not actionable upon its nonoccurrence.

In factual situations similar to the one presented here, courts in other jurisdictions consistently have held that defendants' statements regarding third parties who ultimately fail to come up to plaintiff's expectations are not actionable in fraud. *See, e. g., Springer v. Bank of Douglas,* 82 Ariz. 329, 331–32, 313 P.2d 399, 401–02 (1957); *Goff v. American Savings Association,* 1 Kan.App.2d 75, 79, 561 P.2d 897, 902 (1977) (en banc); *Jeffcoat v. Phillips,* 534 S.W.2d 168, 171–72 (Tex.Civ.App.1976). Appellant argues that Kelly made representations to the effect that Corio's work product was "very good . . . very beautiful," when she should have known that in fact, Corio was not a reputable firm and "had defrauded numerous individuals throughout the Wash-

ington area." To the contrary, there is nothing in the record to reflect that Kelly's representations to appellant were not made in good faith. (Kelly indicated at her deposition that she had attended a reception at the home of a bank customer who was very satisfied with the quality of the renovations performed by Corio for him.) Further, appellant offers no evidentiary support for her conclusory allegation that Kelly should have known that Corio had defrauded numerous others—nor even that such frauds actually took place.

■ Moreover, Kelly's failure to disclose her acquaintance with Glenna Cortinas hardly can be viewed as a willful omission of a material fact. It is quite common for persons in business and professional circles to make recommendations of other firms or individuals with whom they are acquainted. Such referrals do not amount to guarantees by the one making the recommendation as to the quality of the work to be performed, nor does one's failure to disclose his acquaintance with the party whom he is recommending indicate any intent to mislead the person to whom that recommendation is addressed.

■ It is equally clear that Kline made no material misrepresentations. Appellant contends that Kline led her reasonably to believe that Corio was fully bonded. However, appellant admitted in her deposition that Kline informed her that proof of the contractor's bonding was no longer necessary.[7] Thus, appellant's argument in this vein is without merit.

■ Apart from this, however, the type of representations involved in this case— even if appellant had shown them to be false or misleading—is not the type on which she was entitled to place dispositive reliance. Appellant had an adequate opportunity to conduct an independent investigation into Corio's reputation and to obtain references from past customers of Corio; the bank certainly did not have exclusive access to such information.[8] Cf. McCarthy v. Cahill, 249 F.Supp. 194, 198 (D.D.C.1966) (if unreasonable for a party to rely solely on representations made to him, then he is precluded from moving to set aside the transaction).

■ Appellant cites several cases ostensibly holding that "innocent" misrepresentations by third parties to a transaction may be actionable in fraud. For instance, in Spargnapani v. Wright, supra, the plaintiff bought a house after a real estate broker had represented to him that the heating system was satisfactory and that the oil burner was new. In fact, the seller of the house, aware of defects in the boiler, had patched and repainted it before sale, but had not disclosed these facts to the broker. In a suit by the buyer against the broker for misrepresentation, our predecessor court held that the broker could be held liable despite his professed innocence, because he had displayed a "pretense of knowledge" while acting as the seller's agent. In Stein v. Treger, 86 U.S.App.D.C. 400, 182 F.2d 696 (1950), whiskey brokers were held liable for representing as a matter of fact that their principal was financially responsible, when in reality (but unbeknown to the brokers) there were liens against the liquor. These cases are readily distinguishable from the case before us. In each of the above-cited cases, the persons making the "innocent" misrepresentations were agents of a party to the transaction in question, and each evinced a pretense that his representation was true as a matter of fact. Those cases stand for the proposition that the requisite "knowledge of falsity" may be inferred when the defendant's representation of a material fact "involves his own business or property as to which he is bound and must be presumed to know the truth." Darnell v. Darnell, 91 U.S.App.D.C. 304, 307, 200 F.2d 747, 749 (1952). Obviously, those conditions are not present here. Riggs was neither an agent nor a fiduciary of Corio,

---

**7.** *See* text accompanying note 4, *supra*.

**8.** We note that at the time of the alleged misrepresentations, appellant was a 31-year-old woman who had been a party to several real estate transactions in the past.

and no material representations were offered as matters of fact. Accordingly, the trial court's grant of summary judgment on the fraudulent misrepresentation count must stand.

## IV

The District of Columbia Consumer Protection Procedures Act ("Act" or "CPPA"), D.C.Code 1978 Supp., Title 28 App., §§ 1–10, is to say the least, an ambitious piece of legislation which seeks to prohibit a long list of "unlawful trade practices." *Id.*, § 5. The Act created the Office of Consumer Protection and established an elaborate procedure within that office for the adjudication of consumer complaints. *Id.*, §§ 3, 4, 6. If he so chooses, however, an aggrieved consumer may bypass the administrative remedy and bring a complaint directly in the Superior Court. *Id.*, § 6(k)(1).

In this case, appellant took the latter route, alleging in Superior Court that the actions of Riggs' employees Kelly and Kline constituted trade practices proscribed by § 5 of the Act. In particular, she complained that Kelly's and Kline's misrepresentations concerning Corio violated the following provisions:

§ 5. Unlawful trade practices.

It shall be a violation of this act, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to:

(a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;

(b) represent that the person has a sponsorship, approval, status, affiliation, certification or connection that the person does not have.

\* \* \* \* \* \*

(d) represent that goods or services are of particular standard, quality, grade,

style or model, if in fact they are of another;

(e) misrepresent as to a material fact which has a tendency to mislead;

(f) fail to state a material fact if such failure tends to mislead; \* \* \*.

The trial court granted summary judgment to Riggs on this count as well, apparently agreeing with Riggs' argument that, even assuming that the employees' alleged representations violated the literal language of those provisions, Riggs could not be held liable because it is not within the class of "persons" whose conduct the CPPA seeks to regulate. Appellant urges that the trial court's ruling went against the plain language of the statute and therefore was erroneous.

In determining whether Riggs is subject to the CPPA in the context of this case, we are called upon to reconcile the facially contradictory language of the Act with its legislative history. Appellant relies primarily upon the literal wording of § 5, which makes the Act's provisions applicable to any "person" who violates them. "Person" is broadly defined in § 2(a)(1) of the Act to include any individual, organization, or entity. *See Council of the District of Columbia, Committee on Public Services and Consumer Affairs, Report on Bill 1–253*, at 13 (Mar. 24, 1976) (hereinafter *"Committee Report"*). Thus, appellant argues, Riggs comes within the plain language of the statute.

Riggs contends, on the other hand, that when the statute is read as a whole in conjunction with its legislative history, it becomes clear that the Council intended the CPPA to apply only to trade practices arising out of the supplier-purchaser relationship. First of all, although § 5 on its face prohibits any "person" from engaging in unlawful trade practices, the legislative history describes § 5 as prohibiting such practices by "merchants."[9] *Committee Report,*

---

9. Section 2(a)(3) of the Act defines "merchant" as follows:

(3) "merchant" means a person who does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or

services, or a person who does or would supply the goods or services which are or would be the subject matter of a trade practice[.]

at 17. Moreover, § 6 of the Act, which sets forth the complaint procedure at the administrative level, provides for the filing of a complaint by a "complainant" against a "respondent," the latter term being defined as follows:

> (5) "respondent" means one or more merchants alleged by a complainant to have taken part in or carried out a trade practice, or the successors or assigns of such merchants, and includes other persons who may be deemed legally responsible for the trade practice[.] [CPPA § 2(a)(5).]

While appellant urges that the language "other persons who may be deemed legally responsible for the trade practice" can include disinterested third parties such as Riggs, the bank counters that appellant's analysis is inconsistent with the *Committee Report*, which further explains:

> (5) "respondent" is the merchant, or another merchant further along the supply chain who is deemed legally responsible under relevant substantive law, defending before the Office. [*Committee Report*, at 14.]

 We agree with Riggs that the CPPA, at least insofar as it is enforceable at the administrative level, was designed to police trade practices arising only out of consumer-merchant relationships. The Act clearly contemplates complaints against "merchants" who "supply the goods or services which are or would be the subject matter of a trade practice." CPPA § 2(a)(3). While a "merchant" is not limited to the actual seller of the goods or services complained of, he must be a "person" connected with the "supply" side of a consumer transaction. *Committee Report*, at 13. Quite plainly, Riggs does not fall within that category in the context of this case.

 Appellant points out, however, that the terms "merchant" and "respondent" arise in the Act only with regard to the complaint procedures before the Office of Consumer Protection, ostensibly there is no limitation on whom can be charged with a § 5 unlawful trade practice when suit is brought in Superior Court. Although her argument has some surface appeal, we must keep in mind the well-established rule of statutory construction that a statute should be read and construed as a whole within the context of the entire legislative scheme. *See, e. g., United Mine Workers v. Andrus*, 189 U.S.App.D.C. 110, 114, 581 F.2d 888, 892, *cert. denied*, 439 U.S. 928, 99 S.Ct. 313, 58 L.Ed.2d 321 (1978); 2A C.D. Sands & A. Sutherland, Statutes and Statutory Construction § 46.05 (4th ed. 1973). This is particularly true where, under a literal reading, different provisions within the same statute would produce inconsistent results. Obviously, there is an inconsistency between the limited scope of the CPPA as evidenced in its definitional section and the broad reference to "person" in § 5. When there is a conflict between general and specific terms in a statute, the more specific provision usually will prevail. *See District of Columbia v. Linda Pollin Memorial Housing Corp.*, D.C.App., 313 A.2d 579, 583 (1973); *F.T.C. v. Manager, Retail Credit Co.*, 169 U.S.App.D.C. 271, 276, 515 F.2d 988, 993 (1975). By applying that principle and reading the statute as a whole, we conclude that the class of persons subject to suit under § 5 necessarily is restricted by the narrower reach of the statute as outlined in its definitional section.[10]

 Finally, appellant notes that § 4(c)(2)(D) of the Act excludes broadcasters, newspapers, and other media from liability for the content of their advertising, except insofar as that advertising applies to

---

This definition is summarized in the *Committee Report*, at 13:
> (3) "merchant" is a person on the "supply" side of a consumer transaction.

**10.** In discussing § 6(k)(1) of the Act—*i. e.*, the provision which allows a complainant to bring suit directly in Superior Court without exhausting his remedies before the OCP—the *Commit-*

*tee Report* unsurprisingly makes no mention of any expanded class of defendants available to a plaintiff in a court trial, as compared with an OCP proceeding. In fact, the report specifically refers to the recovery of punitive damages in a court action, depending upon the severity of "the merchant's unlawful trade practice." *Committee Report*, at 23.

the broadcaster's or publisher's own goods and services or that he has knowledge that the advertising is in violation of District of Columbia law. The purpose of that exclusion, according to appellant, was to exclude one—but only one—class of third parties from liability for its "representations." Any other interpretation, including that urged by Riggs, would have the disfavored effect of rendering the media advertising exclusion superfluous. *See generally United States v. Campos-Serrano*, 404 U.S. 293, 301 & n.14, 92 S.Ct. 471, 476 & n.14, 30 L.Ed.2d 457 (1971); 2A C.D. Sands & A. Sutherland, *supra*, § 46.06 (where possible, a statute should be construed so as to give effect to all its provisions, so that no part will be inoperative or superfluous). We disagree with appellant that our holding that disinterested third parties are outside the CPPA's coverage necessarily renders the media advertising exclusion superfluous. To the contrary, the media exclusion very likely was included as a means of limiting the application of §§ 5(h) and (i) of the Act, which prohibit misleading advertising. Since a broadcaster or publisher who advertises consumer goods and services conceivably may be considered "a person on the 'supply' side of a consumer transaction" (*see* note 9, *supra* ), the Council very well may have deemed such an exclusion necessary to protect the media's First Amendment rights. The media exclusion thus has the effect of limiting the applicability of the word "advertise" in §§ 5(h) and (i) to the merchants whose goods and services are advertised; the members of the media whom those merchants hire to convey their messages are exempt. Such an analysis is not inconsistent with our holding, nor does our holding render § 4(c)(2)(D) inoperative.

In finding that Riggs is not subject to the Act in this case, we reach the only reasonable result. Even though the CPPA evidently was intended to be a far-reaching consumer protection law, we cannot conclude that the Council sought to impose liability as a guarantor upon any private individual (or his employer) who recommends the goods or services of a particular merchant to another.[11]

*Affirmed.*

11. Because of the narrow construction we give to the CPPA in this decision, we need not discuss whether the pertinent "unlawful trade practices" enumerated in § 5 are constitutionally infirm—either on their face or as applied—by virtue of vagueness, overbreadth, or impingement on free speech.