United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued April 16, 1998 Decided August 7, 1998

 No. 97-7096

 Marcia Chedick, 

 Appellee/Cross-Appellant

 v.

 Thomas Nash and 

 Capital City Mortgage Corporation, 

 Appellants/Cross-Appellees 

 Consolidated with No. 97-7151

---------

 Appeals from the United States District Court 

 for the District of Columbia 

 (No. 96cv00251)

 Eric J. Sanne argued the cause and filed the briefs for 
appellants/cross-appellees.


 Marcia K. Docter argued the cause and filed the brief for 
appellee/cross-appellant.

 Before Edwards, Chief Judge, Henderson, Circuit Judge, 
and Buckley, Senior Circuit Judge.

 Opinion for the court filed by Senior Judge Buckley.

 Buckley, Senior Judge: Capital City Mortgage Corpora-
tion and its president and sole shareholder, Thomas K. Nash 
(collectively "Capital City"), appeal a jury's verdict that they 
defrauded Marcia Chedick. Ms. Chedick, in turn, contests 
the district court's decision to bar some of her testimony 
supporting punitive damages. Both parties contend that the 
district court committed error in computing compensatory 
damages for fraudulent misrepresentation. We affirm the 
judgment but vacate the compensatory damage award and 
remand for reconsideration of those damages.

 I. Background

A. Facts

 On May 24, 1994, Ms. Chedick sought a loan from Capital 
City in order to refinance the mortgage on property she 
owned at 1013 U Street, N.W., Washington, DC. Ms. Ched-
ick had bought the property in exchange for cash and the 
assumption of a note. At the time she approached Capital 
City, Ms. Chedick was in arrears on the note, and a foreclo-
sure sale had been scheduled for May 26.

 Both parties agree that Ms. Chedick reviewed Capital 
City's loan documents only cursorily before initialing them 
and taking them home. Two days later, she received $42,000 
from Capital City that she used to retire the note and to pay 
back taxes on the property. Prior to settlement, Ms. Chedick 
neither read the loan documents nor asked any questions 
about them.

 Capital City specializes in lending money to high risk 
borrowers, on concomitantly onerous terms. In Ms. Ched-
ick's case, the interest rate on the five-year mortgage was 20 
percent per annum for the first four years and 30 percent for 

the final year. If a payment was more than 45 days late, the 
mortgage was considered in default and the interest rate 
immediately rose to 30 percent, where it stayed for the 
remainder of the life of the loan. The note also specified 
various fees, including a 15 percent "late charge" on pay-
ments more than ten days in arrears, a five percent reinstate-
ment fee, and a one percent per month penalty if the proper-
ty was uninsured by the owner--regardless of whether it had 
been insured by Capital City.

 In August 1994, a disagreement arose over the amount that 
Ms. Chedick owed on the mortgage, a dispute which remained 
unresolved a year later. Capital City concedes that the 
amount it then claimed to be due included improper charges. 
Ms. Chedick made no payments in the interim, although she 
states that she proffered two monthly payments that Capital 
City declined to accept on the ground that they were insuffi-
cient. In 1995, Ms. Chedick found a buyer for the property 
and sought to pay off the entire balance of her outstanding 
debt to Capital City from the anticipated proceeds of the sale. 
Capital City allegedly demanded payment of $98,000 to retire 
the loan, which Ms. Chedick claimed was exorbitant and 
refused to pay. As a result, the sale fell through. Ms. 
Chedick retains title to the property, subject to Capital City's 
lien.

B. Procedural Background

 Ms. Chedick filed for personal bankruptcy in 1994. During 
the course of the Chapter 13 proceeding, she filed a claim 
against Capital City alleging breach of contract and fraud. 
Ms. Chedick demanded a jury trial, and Capital City objected. 
The case thereupon was transferred to the district court. See 
28 U.S.C. s 157(e) (requiring parties' consent for bankruptcy 
court to conduct jury trial).

 After proceedings before a magistrate judge, who memori-
alized his decisions in a pretrial order, see Fed. R. Civ. P. 
16(e), the case went to trial on Ms. Chedick's claims of fraud, 
misrepresentation, and breach of contract. Upon finding that 
Capital City had breached its contract with Ms. Chedick and 


had defrauded her, the jury awarded her $35,000 for breach 
of contract, $123,097.85 for fraud, and $100,000 in punitive 
damages. The $35,000 award compensated Ms. Chedick for 
her lost profit on the sale of the property and for various 
charges that she had incurred in the interim. The amount of 
the compensatory award for fraud was exactly the same as 
the amount Capital City claimed to be due on May 15, 1996. 
The court entered judgment against Capital City for 
$258,097.85.

 Capital City filed a motion for "partial new trial and/or for 
remittitur." In its motion, Capital City claimed that, for 
various reasons, the jury's award of compensatory damages 
for fraud was improper. The district court held, however, 
that Ms. Chedick had presented sufficient evidence to sustain 
the jury's finding of fraud and that the damages it awarded 
her were supported by the record. The court also offset the 
damage award by $42,000, the principal amount of the loan.

 Capital City timely appeals the district court's instructions 
concerning the elements of fraud, and the sufficiency of the 
evidence supporting a finding of fraud. Ms. Chedick cross-
appeals the district court's exclusion of evidence concerning 
attorneys' fees and emotional damages. She also contests the 
district court's $42,000 offset.

 The district court had subject matter jurisdiction over this 
case under 28 U.S.C. ss 157(a), (e) & 1334, and we exercise 
appellate jurisdiction pursuant to 28 U.S.C. s 1331. The 
parties are not diverse, and all relevant events occurred in 
the District of Columbia. D.C. law therefore governs. See 
District of Columbia v. Coleman, 667 A.2d 811, 816-18 (D.C.
1995).

 II. Analysis

A. Capital City Appeal

 We address two of Capital City's arguments on appeal: 
(1) that the district court erred in instructing the jury that 
the breach of an implicit contractual representation may be 
tortious and (2) that Ms. Chedick failed to offer any evidence 

supporting detrimental reliance on Capital City's misrepre-
sentation. Because we uphold the jury's verdict of fraud, we 
need not address Capital City's claim that punitive damages 
may not be awarded on the basis of a breach of contract 
alone.

 1. Promissory Misrepresentation

 Fraudulent misrepresentation requires proof of "(1) a false 
representation (2) made in reference to a material fact, 
(3) with knowledge of its falsity, (4) with the intent to deceive, 
and (5) an action that is taken in reliance upon the represen-
tation." Hercules & Co., Ltd. v. Shama Restaurant Corp., 
613 A.2d 916, 923 (D.C. 1992). To prevail, the plaintiff must 
also have suffered some injury as a consequence of his 
reliance on the misrepresentation. See Dresser v. Sunder-
land Apartments Tenants Ass'n, Inc., 465 A.2d 835, 839 (D.C. 
1983).

 Although an erroneous forecast of an event's future occur-
rence is not actionable in tort, where a promisor misrepre-
sents his present intent to perform an act in the future, the 
promisee may state a claim for tortious misrepresentation. 
In Bennett v. Kiggins, 377 A.2d 57 (D.C. 1977), the D.C. 
Court of Appeals explained the distinction:

 When a person positively states that something is to be 
 done or is to occur, when he knows the contrary to be 
 true, the statement will support an action in fraud. On 
 the other hand, a prophecy or prediction of something 
 which it is merely hoped or expected will occur in the 
 future is not actionable upon its nonoccurrence.

Id. at 61. Because the alleged tortfeasor must have misrep-
resented either his current intent to perform or his existing 
knowledge concerning the likelihood that an event would 
occur in the future, the tort of promissory misrepresentation 
is consistent with the general rule that an erroneous repre-
sentation of future events is not tortious. See 37 Am. Jur. 
2d, Fraud and Deceit, s 68 (1968) ("The gist of the fraud in 
such cases is not the breach of the agreement to perform, but 
the fraudulent intent of the promisor, the false representation 


of an existing intention to perform where such intent is in fact 
nonexistent, and the deception of the obligee by such false 
promise."); Restatement (Second) of Torts s 525 (1976) 
("One who fraudulently makes a misrepresentation of fact, 
opinion, intention or law for the purpose of inducing another 
to act or to refrain from action in reliance upon it, is subject 
to liability to the other in deceit for pecuniary loss caused to 
him by his justifiable reliance upon the misrepresentation."); 
see also Fraud, 37 C.J.S. s 15, at 195 (1997).

 Ms. Chedick argued at the trial and repeats on appeal that, 
consistent with its practice, Capital City intended to prevent 
her from repaying her mortgage so that it could foreclose on 
her property and that she would not have signed the note had 
she known that Capital City would seek to frustrate her 
performance. Chedick Complaint at p 46. In support of her 
claim, Ms. Chedick relied upon evidence that Capital City 
repeatedly miscalculated her monthly obligation, that it 
forced her into default by capitalizing costs that should have 
been assessed as separate fees, that its conduct was consis-
tent with how it had treated other customers (after which it 
had foreclosed on them), and that it significantly overestimat-
ed the amount required to pay off the mortgage (thereby 
scuttling a sale that would have precluded it from obtaining 
the property through foreclosure).

 At the close of the trial, the court instructed the jury that

 [t]he general rule is that an action for fraud can exist 
 only if there was a misrepresentation of a past or exist-
 ing fact, not a promise to do something in the future. 
 But a promise made with an existing intention not to 
 perform, that promise can be a fraudulent misrepresen-
 tation. In this case, you must find on the first element of 
 the claim of fraud by a clear and convincing evidence that 
 Capital City ... entered into the promissory note and 
 deed of trust with the intent not to perform.

 You must find that Capital City ... had this intention 
 not to perform at the time that the note was entered into 
 or at the time the promissory [note] was made, and this 
 was the time that the note was signed. A breach of the 

 term of the contract which occurred later cannot alone 
 serve as proof of this intention....

 As you know, the plaintiff has tried to show and 
 produced evidence that the amount of the note and the 
 amount of the liability and the debt was accelerated so 
 fast and so high that Capital City ... must have had the 
 intention not to let her ever pay off the note so they 
 could take over the property.

Similarly, in its order denying a new trial, the district court 
held that

 [i]f a party enters into a contract with the express 
 intention not to honor it, his false promise is a fraudulent 
 misrepresentation which can be actionable as fraud....

 ... Plaintiff argued to the jury that Capital City ... 
 never intended to allow plaintiff to abide by the terms of 
 the agreement, but intended to foreclose on the property 
 from the beginning. The Court finds that this theory fits 
 comfortably within the law regarding promissory fraud.

 Capital City contends that D.C. law recognizes a cause of 
action for promissory misrepresentation only when the prom-
ise is neither memorialized as an explicit contract term (e.g., 
an undertaking to provide $42,000 on a date certain) nor 
implied by law in the contract (e.g., the obligation to act with 
good faith); in other words, the misrepresentation must be a 
collateral statement of fact that induced the execution of the 
contract. Thus Capital City argues that the district court 
misinterpreted D.C. law when it instructed the jury (and 
affirmed in its post-trial order) that the breach of an implicit 
term of a contract could be tortious. We review the district 
court's legal instructions de novo. See Joy v. Bell Helicopter 
Textron, Inc., 999 F.2d 549, 556 (D.C. Cir. 1993).

 It is true that no reported D.C. case has held that a mere 
intent not to perform a contractual duty can give rise to a 
cause of action sounding in tort. Nevertheless, such a hold-
ing is not precluded by any of the cases that have recognized 
that a misrepresentation of one's intent to perform a collater-
al commitment might be tortious. See, e.g., Howard v. Riggs 

Nat'l Bank, 432 A.2d 701, 706-07 (D.C. 1981) (holding that 
defendant had not committed tort because its agent's collater-
al comment had been made in good faith); see also Shear v. 
National Rifle Ass'n, 606 F.2d 1251, 1253-54, 1259 (D.C. Cir. 
1979) (holding that breach of collateral promise was action-
able). Some time ago, we observed in a footnote that "[a] 
promise or contractual commitment may be actionable as a 
misrepresentation if at the time of its making the promisor 
had no intention of carrying it out." Day v. Avery, 548 F.2d 
1018, 1026 n.39 (D.C. Cir. 1976) (citing William Prosser, Torts 
s 109 at 729-30 (4th ed. 1971)). The D.C. courts have neither 
adopted nor rejected the rule averred to in Day. Indeed, our 
own review of District case law suggests that they have had 
no occasion to do either, which is not surprising considering 
that the class of cases to which our comment in Day refers is 
very narrow. The present case, however, falls within Day's 
limited scope. We must therefore decide whether application 
of that rule would be consistent with existing D.C. law.

 To the extent that D.C. courts have spoken to this issue at 
all, they have not rejected the application to contractual 
commitments of the general rule that a misrepresentation of 
one's intent to perform a duty may give rise to a tort. See 
Bennett, 377 A.2d at 61. Despite Capital City's arguments to 
the contrary, it is clear that D.C. law does not distinguish 
between a promisor's breach of implicit and explicit contrac-
tual representations. See Blake Const. Co., Inc. v. C.J. 
Coakley Co., Inc., 431 A.2d 569, 577 (D.C. 1981) (treating 
breach of implicit and explicit contractual obligations in the 
same manner). It is equally plain that every party to a 
contract necessarily represents that it intends to perform all 
its obligations, whether implicit or explicit. See Restatement 
(Second) of Contracts s 1 (1979). The narrow issue before 
us, therefore, is whether the tort of fraudulent misrepresenta-
tion in the District of Columbia includes a cause of action 
arising from a party's intent not to perform a contractual 
obligation that it is about to undertake.

 D.C. courts have distinguished between a failure to perform 
such an obligation and a misrepresentation of one's intent to 
perform. See, e.g., Urban Invest., Inc. v. Branham, 464 A.2d 


93, 98 (D.C. 1983) ("The fact that the repairs were not 
performed ... does not support a conclusion that appellants, 
in representing that the repairs would be completed, never 
intended to carry out the promise."). Similarly, the courts 
have recognized that material misrepresentations upon which 
a party relies may generate a cause of action sounding in tort. 
See, e.g., Howard, 432 A.2d at 706. We are confident, then, 
that if this case were before a D.C. court, it would apply the 
rule that we suggested in our footnote in Day; thus it follows 
that we find no error in the district court's statement of the 
law in its jury instructions and in its post-trial order.

 2. Sufficiency of the Evidence Supporting the Elements of 
Fraud

 A jury's "verdict will stand unless the evidence and all 
reasonable inferences that can be drawn therefrom are so 
one-sided that reasonable men and women could not disagree 
on the verdict. But the evidence must be more than merely 
colorable; it must be significantly probative." Smith v. 
Washington Sheraton Corp., 135 F.3d 779, 782 (D.C. Cir. 
1998) (internal quotation marks and citations omitted).

 Capital City contends that no misrepresentation occurred 
here; and even if one did, that Ms. Chedick failed to prove 
either that she detrimentally relied on Capital City's implicit 
representation that it would act in good faith or that its 
alleged misrepresentation caused any ascertainable damage. 
Capital City also alleges that there is no contemporaneous 
evidence that it intended to breach its duty to act in good 
faith.

 While Capital City is correct that Ms. Chedick failed to 
produce a smoking gun, she did present circumstantial evi-
dence that Capital City intended from the outset to ignore its 
duty of good faith and fair dealing. By capitalizing closing 
fees (rather than charging them to her as ancillary expenses), 
Capital City prematurely caused Ms. Chedick's account to go 
into default and the interest rate to rise to 30 percent even if 
she had made the scheduled monthly payments on time. Ms. 
Chedick also presented evidence that Capital City's practice 
was to use consistently faulty accounting together with the 

harsh terms of its notes to confuse and overburden its 
mortgagees, thereby forcing them into default. The jury was 
certainly entitled to take this pattern into account in finding 
that, from the outset, Capital City did not intend to act in 
good faith.

 Capital City's remaining arguments derive from the theory 
that Ms. Chedick (who still retains title to 1013 U Street) 
could not have been defrauded because she was on the verge 
of losing the property at the time she entered the loan 
agreement and would have lost it if she had not secured the 
Capital City loan. Capital City ignores the fact that, in all 
likelihood, Ms. Chedick would have been in a better position 
financially if she had not secured the mortgage, even though 
it permitted her to retain nominal control over the property.

 When she sought to sell 1013 U Street and pay off the 
Capital City mortgage, the property was valued at $135,000. 
Capital City, however, claimed a lien of $98,000, leaving Ms. 
Chedick with a net residual value of $37,000. Thus entering 
into the mortgage agreement would have harmed Ms. Ched-
ick if her equity prior thereto exceeded that amount.

 Ms. Chedick testified that she had purchased 1013 U Street 
for $100,000 and that in 1994, when she sought the loan from 
Capital City, it was worth about $120,000. At that time, Ms. 
Chedick had a cash investment in the property of $68,000, but 
owed $32,000 on the original note and $10,000 in back taxes. 
Thus, if the foreclosure sale had gone through in 1994 and the 
property been sold for its estimated value, Ms. Chedick would 
have netted $78,000 ($120,000 minus $42,000 for the note and 
back taxes), for a profit of $10,000 over her investment. By 
contrast, if the 1995 prospective sale had materialized, she 
would have suffered a $31,000 loss ($68,000 less the $37,000 
she would have netted from it).

 We conclude, then, that the record evidence supports both 
the jury's finding that Capital City misrepresented its intent 
to perform in good faith and its conclusion that Ms. Chedick 
suffered injuries as a result of her signing the loan agreement 
in reliance on that misrepresentation. The jury was entitled 
to find that Capital City's consistent overstatement of the 


amount due on Ms. Chedick's mortgage, its improper account-
ing, and the resulting frustration of her efforts to pay down 
the mortgage breached Capital City's duty to act in good faith 
and confirmed its intent to ignore that obligation.

B. Ms. Chedick's Cross-Appeal

 1. Exclusion of Evidence Concerning Emotional Distress 
and Attorneys' Fees

 At the trial, the district court prohibited Ms. Chedick from 
introducing evidence of either the attorneys' fees she had 
incurred or the mental anguish she had suffered as a conse-
quence of Capital City's conduct. Ms. Chedick contends that 
she should have been allowed to present both types of evi-
dence in support of her claim for punitive damages. Capital 
City argues that the district court correctly applied the Rules 
of Evidence to bar her from introducing such evidence. We 
review the district court's decision to exclude evidence for 
abuse of discretion. See United States v. Clarke, 24 F.3d 257, 
267 (D.C. Cir. 1994).

 When Ms. Chedick sought to testify about the amount of 
her attorneys' fees, Capital City objected on the ground that 
she had not "provided any discovery or any exhibits on that." 
The court sustained the objection. Because Ms. Chedick 
failed to produce documentary evidence in support of her 
claim, the court's exclusion of her testimony was not an abuse 
of discretion. See Fed. R. Civ. P. 26(a)(1)(C) (mandating 
disclosure of "a computation of any category of damages 
claimed by the disclosing party"); Fed. R. Evid. 801(a)-(c), 
802 (hearsay).

 The district court also sustained Capital City's objection to 
Ms. Chedick's testifying to her emotional distress. The court 
stated:

 I'm not going to let you pursue [emotional damages], 
 then. What I will do is ... if early next week you're 
 [Ms. Chedick's counsel] going to find something about 
 emotional damages being recoverable, even though 
 there's no specific claim in the complaint, a separate 

 claim in the complaint about it, I may let you reopen with 
 this plaintiff [Ms. Chedick] to have to go on the witness 
 stand.... But at the moment, I'm sustaining the objec-
 tion.

Ms. Chedick did not seek to reopen the court's ruling and 
failed to present any legal arguments in support of her right 
to present evidence of emotional distress in support of a claim 
for punitive damages. In her opening appellate brief, howev-
er, she argues that emotional damages may be introduced to 
support a claim for punitive damages. By failing to present 
those arguments to the district court, Ms. Chedick forfeited 
her opportunity to present them on appeal. Singleton v. 
Wulff, 428 U.S. 106, 120 (1976).

 In her reply brief, Ms. Chedick attempts to defend her 
right to testify concerning her attorneys' fees and emotional 
distress by pointing out that these issues were noted in the 
magistrate judge's pretrial order. See United States v. 
Hougham, 364 U.S. 310, 315 (1960) ("That pretrial order, as 
authorized by Rule 16, conclusively established the issues of 
fact and law in the case...."); Smith v. Washington Shera-
ton Corp., 135 F.3d 779, 784 (D.C. Cir. 1998); Johnson v. 
Geffen, 294 F.2d 197, 199-200 (D.C. Cir. 1960). Because she 
made this argument for the first time in her reply brief, it is 
forfeited. See McBride v. Merrell Dow & Pharmaceuticals, 
Inc., 800 F.2d 1208, 1211 (D.C. Cir. 1986) (holding arguments 
first raised in reply brief are forfeited). Under the circum-
stances, the district court's exclusion of Ms. Chedick's testi-
mony concerning these matters was not an abuse of discre-
tion.

 2. Damage Award

 Both Ms. Chedick and Capital City agree that the district 
court erred when it reduced aggregate damages by $42,000, 
the amount of the loan, without addressing the value of 
Capital City's remaining lien on the property. Ms. Chedick 
seeks to have the computation of the lien remanded to the 
district court. Capital City claims that no remand is neces-
sary but that we should offer Ms. Chedick the choice between 
either a judgment of $123,097.85 (which the jury evidently 


accepted as the amount due on the note) with the property 
subject to a lien in the same amount or an offset of 
$123,097.85 against the original jury verdict with the property 
free and clear of the lien. Because Capital City did not file a 
cross-claim for enforcement of its lien, that remedy is not 
properly before us, and we decline to consider that element of 
Capital City's argument.

 The jury apparently awarded Ms. Chedick $123,097.85 on 
the basis of her exhibit XXX, which was a Capital City ledger 
statement indicating that she owed that amount on the mort-
gage as of May 15, 1996. At the trial, however, Capital City's 
attorney claimed that $97,000 was sufficient to cover the 
principal and interest due on the note, as well as taxes and 
insurance and foreclosure costs. While it is apparent that the 
jury intended to award Ms. Chedick the amount then owing 
on the note, there appears to be some question as to what 
was actually owed. We therefore vacate the award of com-
pensatory damages for fraud and remand it to the district 
court for a determination of the amount due on the mortgage. 
As there is no dispute that Ms. Chedick received $42,000 from 
Capital City at the outset, she has had the benefit of that 
payment. Therefore, in awarding compensatory damages on 
remand, the district court should again subtract $42,000 from 
what it finds to have been due.

 III. Conclusion

 The district court's legal instructions to the jury were 
correct, and the jury's verdict is consistent with the evidence 
presented at the trial. The verdict is therefore affirmed. 
Because the basis for it is uncertain, we vacate the 
$123,097.85 award of compensatory damages for fraudulent 
misrepresentation and remand to the district court for fur-
ther consideration.

 So ordered.