**Vanessa ARMSTRONG, Plaintiff,**

v.

**ACCREDITING COUNCIL FOR CONTINUING EDUCATION & TRAINING, INC., et al., Defendants.**

**Civ. A. No. 91–3135 (RCL).**

United States District Court, District of Columbia.

Sept. 8, 1993.

Alan Butler Morrison, Michael Edward Tankersley, Brian Wolfman, Public Citizen Litigation Group, Washington, DC, for plaintiff.

Joseph William Koegel, Jr., Steptoe & Johnson, Washington, DC, Henry Weinstock, Nossaman, Guthner, Know & Elliott, Los Angeles, CA, for defendants Accrediting Council for Continuing Educ. & Training, Inc., Bank of America NT & SA, and California Student Loan Finance Corp.

Amy E. Hancock, Paul Joseph Pantano, Jr., McDermott, Will & Emery, Washington, DC, Mark E. Shure, Keating & Shure, Chicago, IL, for defendant Higher Educ. Assistance Foundation.

Fred E. Haynes, U.S. Atty.'s Office, Washington, DC, for defendant Lamar Alexander.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before the court on each defendant's motion to dismiss the complaint. Upon consideration of the filings of counsel and the relevant law, and for the reasons stated below, defendants' motions will be granted in full or in part in accordance with this memorandum opinion.

## I. BACKGROUND

### A. The Facts of this Case.[1]

This case is a class-action suit brought by plaintiff on behalf of a putative class of former students of NBS Automotive School ("NBS"), a for-profit vocational school.[2] Plaintiff claims that NBS arranged that plaintiff receive a Guaranteed Student Loan ("GSL") under the Higher Education Assis-

---

1. For purposes of addressing defendants' motions to dismiss in this opinion, the court will accept as true plaintiff's version of the facts and will examine those facts in the light most favorable to plaintiff.

2. NBS no longer is in business, and plaintiff has not attempted to sue the school or any of its former directors, officers, or employees.

tance Act of 1965, as amended, 20 U.S.C. § 1071 [3] *et seq.* ("the HEA"); however, plaintiff alleges that NBS could not—and did not—provide her with the education for which she paid (largely via the proceeds of her student loan). Plaintiff also asserts that she, as well as members of the class she hopes to represent,[4] were injured as a result of NBS's misrepresentations and educational practices, which allegedly violated the HEA, the standards of its accrediting body, and various D.C.Code provisions.

The defendants to this suit are five:

- Accrediting Council for Continuing Education & Training, Inc. ("ACCET") is the agency which granted accreditation to NBS.

- California Student Loan Finance Corporation ("CSLFC") is a corporation which acquires student loans under the HEA. It has received proceeds from payments made on plaintiff's GSL.

- Bank of America ("BA") is an "eligible lender" under 20 U.S.C. § 1085(d) and, having purchased plaintiff's GSL as trustee for—and at the direction of—CSLFC, is the current "holder" of plaintiff's loan. *See* § 1085(i).[5]

- Higher Education Assistance Foundation, Inc., ("HEAF") is a guarantee agency under 20 U.S.C. §§ 1078 & 1085(j) and is the guarantee agency for plaintiff's GSL.

- Defendant Secretary of Education, ("the Secretary") is sued in his official capacity. The Secretary is responsible for the GSL program and is the ultimate guarantor of all GSLs.[6]

Plaintiff alleges that in June of 1988, she contacted NBS about its vocational program. NBS explained that its one-year program cost in excess of $5000, but that a GSL could be arranged to pay for most of the tuition. Subsequently, plaintiff paid $1,317.91 to NBS; NBS presented plaintiff with a loan application and a promissory note for a $4000 GSL. Plaintiff alleges that NBS—not the lender, First Independent Trust Company of California [7]—prepared the loan application, selected the lender, determined the loan amount, and prepared the promissory note. The loan was then approved by First Independent Trust and HEAF (which, as the guarantee agency, is required to approve all GSLs). Shortly thereafter, BA, as trustee for—and on behalf of—CSLFC, acquired the note from First Independent Trust.

Plaintiff alleges that NBS, although certified as an eligible institution under the HEA by the Secretary and accredited by ACCET, failed to satisfy the statutory and regulatory requirements imposed upon eligible institutions. Plaintiff also alleges that ACCET failed to withdraw NBS's accreditation even though it knew that NBS failed to meet statutory requirements under the HEA as well as ACCET's own accreditation standards.

In addition, plaintiff alleges that NBS violated various provisions of the District of Columbia Municipal Regulations, the District of Columbia Code, and federal law in its

---

3. In the interest of brevity, the court's references to the HEA's provisions will be by section number only (all section numbers exceed 1071). Also relevant to this opinion are regulations promulgated under the HEA; as these are found in 34 C.F.R., Parts 600, 668, and 682, their section citations all are in the 600s. Finally, relevant D.C.Code sections are distinctive in that the title and section are joined, e.g. § 28–3807.

4. The briefing on the class certification issue has been deferred pending the court's resolution of defendants' motions to dismiss. Pursuant to the accompanying Order, plaintiff shall file her motion for class certification within thirty days of the date of the Order.

5. As the interests of BA and CSLFC are inextricably linked, they jointly filed a motion to dismiss.

The court will refer to them as CSLFC/BA throughout this opinion.

6. Most interesting about this list is the entity not included: NBS (or, for that matter its officers, directors, agents, and owners). Apparently, plaintiff is attempting to reach a deeper pocket.

 Also interesting is the fact that this suit continues despite Congress' passage of 20 U.S.C. § 1087(c)(1). That statute provides for the discharge of any obligation on a student loan if the borrower's school closes. Although that statute does not afford plaintiff complete relief, it certainly would seem to make much of this suit unnecessary.

7. First Independent Trust retains no interest in plaintiff's GSL and is not a party to this suit.

representations to plaintiff, its conduct under the HEA, and its actual education.

Based on these facts, plaintiff has filed a four-claim complaint.[8] In her first claim for relief, against ACCET, plaintiff (on behalf of the class she purports to represent) requests treble damages under D.C.Code § 28–3905(k) for ACCET's alleged violations of various aspects of § 28–3904 as well as for ACCET's aiding and abetting NBS in violations of the same statute.

In her second claim, against CSLFC/BA, HEAF, and the Secretary, plaintiff (again on behalf of the putative plaintiff class) seeks to void the GSL contracts for mistake and illegality. Similarly, in the third claim, against the same defendants (and again on behalf of the class), plaintiff seeks to cancel the GSLs based on claims and defenses assertable against NBS. Finally, in the fourth claim, asserted individually against CSLFC/BA, HEAF, and the Secretary, plaintiff seeks to cancel her GSL based upon NBS's fraud, misrepresentation, and unfair trade practices.

B. *The Guaranteed Student Loan Program.*

Before examining defendants' motions, it is appropriate to briefly sketch out the workings of the student loan program.

Pursuant to the HEA, the Secretary administers the GSL program. Under that program, the Secretary specifies the terms and conditions of GSLs, agrees to make certain payments to schools, lenders, and guarantee agencies if they satisfy the requirements of the program, and serves as the ultimate guarantor of GSLs.

To receive payments under the GSL program, schools, like NBS, must qualify as "eligible institutions" (defined by 20 U.S.C. § 1085(a)) and meet statutory regulatory requirements set forth in the HEA and 34 C.F.R. § 600.1 *et seq.* In addition to these requirements, an eligible institution must be accredited by an accrediting agency or reliable authority; in this case, that requirement was fulfilled by defendant ACCET.

GSLs may be made or held by "eligible lenders" (defined by § 1085(d)). The lender is responsible for processing the loan, but in certain circumstances it may delegate loan-making functions to the eligible institution itself. In plaintiff's case, CSLFC (and BA as its trustee) qualifies as the lender since it is the current holder of plaintiff's loan.[9]

A guarantee agency, like HEAF in this case, has entered into a guarantee agreement with the Secretary whereby the guarantee agency agrees to insure GSL loans while the Secretary agrees to reinsure the loans. The guarantee agency has some responsibility for policing institutions and lenders. *See* § 682.-401(b)(10).

Typically, if a student defaults, the lender (or holder) assigns the loan to a guarantee agency to collect the loan; the guarantee agency pays the lender the unpaid balance of the loan. In addition, the Secretary agrees to reimburse the guarantee agency for all costs expended in insuring the loan as well as in pursuing collection efforts on the loan.

## II. *FIRST CLAIM FOR RELIEF: ACCET'S MOTION TO DISMISS.*

The Accrediting Council for Continuing Education & Training, Inc. ("ACCET") has moved to dismiss the first claim for relief in the complaint under Fed.R.Civ.P. 12(b)(6). (The first claim is the only one that pertains to ACCET.) In the alternative, ACCET has moved for summary judgment under Rule 56.[10]

---

**8.** Defendants have not challenged plaintiff's standing to bring this suit or plaintiff's choice of venue. The court determines that it has jurisdiction to adjudicate the claims in the complaint under 28 U.S.C. §§ 1331 and 1367 and 20 U.S.C. § 1082(a)(2).

**9.** Thus, even though First Independent Trust Company made the loan, when it transferred it to BA, it lost its lender status. Note that First Independent Trust is not a party to this case and has been accused of no wrongdoing.

**10.** ACCET never filed the necessary supporting documents for a motion for summary judgment under the Local Rules. As a result, the court will consider ACCET's motion to be one solely for *dismissal* of the action, not one for summary judgment.

Plaintiff's allegations are that ACCET's allegedly false and misleading misrepresentations violated D.C.Code. § 28–3904(a), (b), (e), and (f). Complaint ¶ 64. Plaintiff also alleges that ACCET's representations aided and abetted NBS in violating the same code provisions. Under § 28–3904, it is a violation of the Consumer Protection Procedures Act ("CPPA") for any "person" to engage in conduct enumerated in a list of prohibited actions.

However, ACCET counters that decisions of the District of Columbia Court of Appeals have narrowed the definition of "person" such that ACCET's activities are not covered by the CPPA. Plaintiff objects to ACCET's motion to dismiss, stating first, that the CPPA governs ACCET; and second, that ACCET ignores plaintiff's common law fraud and misrepresentation claim. As to the first objection, the court accepts ACCET's position; as to the second, the court must accept plaintiff's.

### A. Plaintiff's Claim under the CPPA.

■ First, there is no case of the District of Columbia Court of Appeals directly on point. Nor is there a case in which a party successfully sued a person who merely accredited the products or services of another. It is not the place of the federal district court to extend D.C. law so significantly (as plaintiff wishes) and thereby create a new, more rigorous standard of liability for D.C. citizens.

Moreover, if the court abandoned this principle, it nonetheless would not extend the CPPA to create liability on the part of ACCET because the court believes that Court of Appeals ordinarily would not subject an accrediting agency such as ACCET to the requirements of the CPPA. The case most nearly—if obliquely—addressing this issue is *Howard v. Riggs Nat'l Bank*, 432 A.2d 701 (D.C.App.1981). In that case, an employee of Riggs recommended a construction contractor to a loan customer (Howard). Howard eventually contracted with the contrac-

tor, but the work was never completed; Howard suffered the loss of her deposit. She sued Riggs under the CPPA, alleging violations of current § 28–3904(a), (b), (d), (e), and (f). The Court of Appeals dismissed her suit, however, holding that the definition of "person" in § 28–3904 contradicted other provisions of the CPPA as well as the legislative history of the act. Therefore, the court narrowed the universe of persons subject to suit under the CPPA to " 'person[s]' connected with the 'supply side of a consumer transaction.' " 432 A.2d. at 709 (citing *Council of the District of Columbia, Committee on Public Services and Consumer Affairs, Report on Bill 1–253* at 13 (Mar. 24, 1976)). The court also adopted language from the Committee Report which similarly limited the CPPA to "the merchant, or another merchant further along the supply chain who is deemed legally responsible under relevant substantive law. . . ." 432 A.2d at 709 (citing *Report* at 14). Finally, the court concluded with the following admonition:

> Even though the CPPA evidently was intended to be a far-reaching consumer protection law, we cannot conclude that the Council sought to impose liability as a guarantor upon any private individual (or his employer) who recommends the goods or services of a particular merchant to another.

432 A.2d at 710. No subsequent case has amended this holding.

When the present case is examined in the light of *Howard*, the court finds that the CPPA does not apply. ACCET is not a merchant; nor does it supply goods or services to. or through NBS. Rather, ACCET's accreditation serves merely to recommend the services of a distinct, separate entity.[11] Although ACCET technically qualifies as a member of the "supply" side of the NBS–Armstrong transaction (or, more accurately, ACCET is not on the "demand" side of the equation), it is not on the supply side in the manner envisioned by the drafters of the CPPA.

---

**11.** This type of accreditation or licensing should be distinguished from activity that is prohibited by the CPPA: a false representation by a seller of a product or service that the product or service is licensed or accredited by some licensing or accrediting agent. Although plaintiff attempts to equate the two, they are significantly distinct acts with significantly different legal consequences.

Plaintiff attempts to distinguish her case from *Howard* by stating that the *Howard* limitation is relevant solely if the recommender is a disinterested party obtaining no benefit from the transaction. The court need not determine whether plaintiff's reading of either *Howard* or the CPPA is correct, however, as plaintiff fails to allege in her complaint that ACCET is anything but a disinterested party. When an individual is not proceeding pro se, but rather is represented by counsel as experienced as those representing plaintiff in this case, the court cannot lightly skip over such an omission.

In addition, although plaintiff later—in her brief in opposition to ACCET's motion to dismiss—asserts that ACCET was "clearly affiliated, both financially and through its governance," with NBS, Plaintiff's Opposition to ACCET Motion to Dismiss at 11, this summary assertion is not supported by plaintiff's own allegations (even when they are viewed in the light most favorable to her). First, plaintiff does not allege that ACCET profited from its accreditation of NBS; on the contrary, plaintiff acknowledges that ACCET is a not-for-profit agency. Second, plaintiff does not claim that NBS controlled ACCET (or vice versa); rather, all the schools accredited by ACCET were members of—and controlled—the organization. Finally, although there may have been a tenuous link between the two organizations, plaintiff does not allege that this link formed the basis for any improper action (or any improper motivation for any action, proper or improper) on the part of ACCET. Thus, plaintiff fails to demonstrate that, under the D.C. Court of Appeals' interpretation of the CPPA in *Howard*, ACCET should be liable to plaintiff.

■ Plaintiff also claims that ACCET aided and abetted NBS in violations of the CPPA, thus creating liability for ACCET as well. This assertion, too, must be rejected. First, no provision of the CPPA creates a cause of action for aider-and-abettor liability; in the absence of such a provision, the court must assume that the Council intended to make liable only those who actually violate the CPPA.[12] Second, even if the court believed that the CPPA encompassed secondary liability, it is not clear from the language of the statute why a "person" not subject to primary liability should be subject to secondary liability. Third, despite the fact that *Howard* was decided twelve years ago (and the CPPA was around long before *Howard* was decided), plaintiff has presented no case from the District of Columbia Court of Appeals, from the D.C. Superior Court, or from any federal court extending liability under the CPPA to aiders and abettors. And, the only case arguably relevant, *Howard*, seems to preclude extending the application of the CPPA to secondary parties not subject to primary liability under the Act. In short, the court holds that the CPPA creates only those causes of action specifically enumerated within its provisions; a cause of action creating liability for aiders and abettors of those who allegedly violate the CPPA is not included.

Thus, even when viewing plaintiff's allegations in the light most favorable to her, the court finds that there is no liability—either primarily or as an aider and abettor—for a non-profit accrediting organization such as ACCET under the CPPA.[13]

### B. *Plaintiff's Claim under Common Law Misrepresentation.*

■ Plaintiff further argues that the First Claim should not be dismissed, even if the court finds that the CPPA does not apply, because plaintiff has stated a case for common law misrepresentation. Plaintiff's argument is somewhat questionable as it is patently evident that the only cause of action plaintiff originally and specifically asserted was one under the CPPA. Complaint ¶¶ 64–

---

**12.** And, as with the CPPA provision just discussed, it is not appropriate for a federal court to create out of whole cloth new state or local causes of action; such initiatives and inventions are properly the responsibility of the D.C. City Council and the D.C. courts.

**13.** The count against ACCET could also be dismissed under 28 U.S.C. § 1367 as this is a matter of state law that should be addressed by the local court, not by the federal district court. ACCET did not raise the issue, however, and the court will not dismiss the claim on § 1367 grounds *sua sponte*.

65. This fact is further supported by the fact that plaintiff's only requested relief is treble damages under the CPPA's damages provision, § 28–3905(k), not damages based on common law grounds. In short, plaintiff nowhere alleges that ACCET is guilty of common law fraud or common law misrepresentation; nor does plaintiff claim damages under either theory.[14]

However, as to the class allegations, plaintiff does state each of the elements sufficiently—albeit with less than perfect clarity—to survive ACCET's motion to dismiss. Thus, even though it appears that plaintiff's common law theory was more a *post hoc* response to ACCET's otherwise successful motion to dismiss than a planned cause of action, the court may not dismiss completely plaintiff's claims against ACCET.[15] Accordingly, the court will grant in part defendant ACCET's motion to dismiss: the First Claim of the complaint is dismissed to the extent it is based on D.C. law. To the extent the claim is based on common law grounds, the motion to dismiss is denied without prejudice.

### III. *SECOND CLAIM FOR RELIEF: MISTAKE AND ILLEGALITY.*[16]

■ Plaintiff's second claim for relief—on behalf of herself and the putative class—is posited against CSLFC/BA, HEAF, and the Secretary. Plaintiff claims that NBS did not meet the HEA's requirements for an "eligible institution" at the time plaintiff received her GSL. As a result, plaintiff asserts, the GSL is void and unenforceable on two common law theories: that the GSL was an illegal contract; and that there was a mistake as to a basic assumption of the contract. In addition, plaintiff insists that she had no knowledge that NBS did not meet the HEA's requirements and that any risk of mistake

properly should be assigned to defendants. Plaintiff seeks restitution of any sums paid on her loan and declares that defendants have a duty to correct any reports indicating that members of the class are in default on the unenforceable loans.

As a starting point, plaintiff acknowledges—as she must—that NBS was certified as an eligible institution by the Secretary at the time plaintiff agreed to her GSL contract. That admission alone would seem to resolve this issue in favor of defendants. However, plaintiff claims that her allegations, which must be accepted as true at the motion to dismiss stage of this litigation, demonstrate that NBS at that time did not meet the statutory or regulatory requirements of the HEA. Thus, citing to 34 C.F.R. § 600.-40(a) ("An institution loses its eligibility on the date that (1) It fails to meet any of the eligibility requirements of this part. . . ."), plaintiff claims that NBS was not eligible on the date of the GSL's inception. As such, plaintiff asserts, her claim for mistake and illegality must stand.

However, plaintiff fails to recognize that, in this country of procedural due process, no termination of a right or a status is so simple or so immediate. And, in fact, the loss of eligibility under the HEA requires notification of the offending school, a hearing before an administrative law judge, and even a possible appeal to the Secretary. *See* 34 C.F.R. Part 668. None of these took place in the case of NBS.

Moreover, the regulation describing the effects of termination, § 668.94, provides solely for prospective changes. For example, "[a] termination . . . (3) Prohibits an institution from making *any other new obligations* . . .; and (4) Prohibits *further* guarantee commitments . . . and prohibits *further* dis-

---

**14.** As to plaintiff herself, a common law claim is negated by the fact that plaintiff never alleges that she relied on ACCET's accreditation. If plaintiff had not made class allegations, plaintiff's omission would be fatal to the first claim for relief.

**15.** Again, the common law claims survive ACCET's motion to dismiss solely because the class allegations are sufficient (or, more accurately, not insufficient) to withstand such a motion.

Thus, even though plaintiff herself fails to allege reliance on ACCET's accreditation, the allegations on behalf of the putative class foreclose dismissal of this claim for relief.

**16.** As plaintiff's second, third, and fourth claims for relief do not address ACCET, all collective references to "defendants" in Parts III. and IV. refer solely to CSLFC/BA, HEAF, and the Secretary.

bursements...." 34 C.F.R. § 668.94(a) (emphases added). There is no indication that, under the regulations, a termination should have a retroactive effect.

Thus, even though the court must accept as true plaintiff's allegations of NBS's condition at the time she signed her loan documents, the fact remains that NBS *at that time* was certified as an eligible institution under the HEA. As NBS was certified for purposes of the HEA, there can be no claim of mistake or illegality, and defendants' motions to dismiss must be granted.[17]

A second grounds for dismissing plaintiff's claim is that her allocation of the risk of mistake is unwarranted and unjust. Plaintiff asserts that the risk of mistake properly is assigned to CSLFC/BA (as assignee of the original lender), and to the Secretary and HEAF (both of which potentially had regulatory oversight over NBS). As for CSLFC/BA, plaintiff's argument certainly is wrong. CSLFC/BA is obligated under the HEA statute and regulations to purchase every loan for which it has funding without any discrimination based on the borrower's choice of school. §§ 1088–1(d)(2)(D) and (d)(3). CSLFC/BA thus had no choice but to purchase this loan regardless of the potential common law claims that plaintiff now asserts. There is no allegation by plaintiff that CSLFC/BA in any way acted improperly; nor is there any assertion that CSLFC/BA had any oversight over NBS or could have in any way affected operations at the school. Certainly, it is both inappropriate and unfair to tax CSLFC/BA, an entirely innocent, law-abiding party, for the errors of NBS.

The court also finds it inappropriate to subject HEAF and the Secretary to the risk

of mistake. Both relied upon the accreditation provided by ACCET. And, there is no allegation by plaintiff that any person notified HEAF or the Secretary of the alleged deficiency in the program of education at NBS, or that either had any knowledge of such deficiency.[18] Finally, plaintiff does not demonstrate why she, who assumably saw the NBS facility before enrolling (or at least should have) and thereby should have noticed that the existing facilities did not comport with those claimed by NBS, should not bear at least some element of blame for the mistake.[19]

In general, plaintiff, the only one of the parties to actually see NBS, wants to shift the risk of mistake to defendants, each of which had little—if any—actual interaction with NBS. However, the court believes that plaintiff was in the best position to determine whether enrolling at NBS was a wise move. Accordingly, the court finds it inappropriate to place the burden of mistake on defendants. At the very least, plaintiff assumes at least as much of the risk of mistake, if not much more.

## IV. THIRD AND FOURTH CLAIMS FOR RELIEF.

Plaintiff's third and fourth claims for relief are related, and the court will address them concurrently. In the third claim, pursued on behalf of herself and the putative class, plaintiff claims that she may assert claims and defenses against NBS (which she allegedly possesses as a result of NBS's violations of D.C. law,[20] breaches of contract, and unfair trade practices) against CSLFC/BA, HEAF, and the Secretary. These defenses survive, plaintiff asserts, by operation of D.C. law, the FTC's Holder Rule, and federal law.

---

**17.** As the court disposes of the second claim for relief on these grounds, it need not address defendants' claim that the HEA preempts these common law defenses. Should the court have analyzed the issue, it would have determined that allowing plaintiff to raise these defenses certainly would have such a deleterious effect on the GSL program, as discussed in Part IV.B., below, that the court would have found it necessary to preempt these claims.

**18.** Even plaintiff did not file a complaint with any proper authorities until several months after she began taking classes at NBS.

**19.** Like CSLFC/BA, HEAF was subject to extensive non-discrimination requirements. *See* § 1078(c)(2)(F).

**20.** Defendant CSLFC/BA argues that a choice of law provision in the loan contracts mandates the application of California law to plaintiff's case. As plaintiff's D.C. law assertions are preempted, inapplicable, or both, the court need not resolve at this stage of the litigation whether California law indeed applies.

In the fourth claim, pursued against the same defendants, plaintiff sues solely on her own behalf. Alleging further misrepresentations on the part of NBS (again in violation of D.C. law), plaintiff claims that D.C. law, the FTC's Holder Rule, and federal law allow her to pursue claims and defenses she has against NBS against the defendants.

Defendants oppose these assertions by interposing preemption, either complete or limited. Barring that, defendants claim that plaintiff has failed to state a claim under any of the theories she asserts. Each of these interrelated claims and defenses is addressed in turn.

### A. *The HEA does not completely Preempt State Law.*

■ HEAF and CSLFC/BA argue that the HEA completely preempts state law, thus rendering plaintiff's reliance on state law remedies ineffectual.[21] It is quite clear, however, that the court must reject this argument. After lengthy exegesis, several other courts have determined that the HEA neither explicitly nor implicitly preempts all state law. *See Tipton v. Secretary of Education,* 768 F.Supp. 540 (S.D.W.Va.1991); *Jackson v. Culinary School of Washington,* 788 F.Supp. 1233 (D.D.C.1992) (*"Jackson I"*).[22]

All parties acknowledge that the HEA does not explicitly preempt all state law, although it does provide a few cases of limited explicit preemptive authority. *See, e.g.,* 20 U.S.C. §§ 1078(d), 1091(a), and 1091(b). However, the parties disagree as to whether the HEA implicitly preempts all relevant

state law. The court determines that plaintiff has the better of the argument: following Supreme Court precedents, particularly *California Fed. Sav. & Loan v. Guerra,* 479 U.S. 272, 107 S.Ct. 683, 93 L.Ed.2d 613 (1986), a court may infer complete preemption only when a statute is so comprehensive that it leaves no room for state law. 479 U.S. at 272, 107 S.Ct. at 683. The HEA is not such a statute.

For instance, the HEA does provide a few circumstances under which a guaranteed student loan borrower's liability is discharged. § 1087. Defendants claim that this section enumerates the *only* conditions under which a borrower's liability may be discharged. However, this section does not provide the *exclusive* universe of events which may lead to discharge, but rather ensures that *every* borrower who dies, becomes permanently and totally disabled, or receives a discharge in bankruptcy, is discharged from his obligation on the loan. Thus, the court can not find that all state law is preempted solely because Congress saw fit to mandate discharge in a few specific circumstances; rather, in addition to these enumerated cases, there are—implicitly—other events which also would result in a discharge, for instance, claims under state law.

Nor can the court accept defendants' argument that the application of *any* state law would undermine the congressional intent behind the HEA. Although the court holds below that the application of some state law provisions does indeed frustrate the HEA, *see* Part IV.B. below, defendants have not

---

**21.** The Secretary does not join the other defendants in this assertion; however, like the other defendants, the Secretary claims that the HEA does preempt specific portions of local law, including many of the local laws here at issue. *See* Part IV.B., below.

**22.** A contrary decision was reached in *Graham v. Security Sav. & Loan,* 125 F.R.D. 687 (N.D.Ind. 1989). However, although the Seventh Circuit Court of Appeals affirmed the conclusion of the *Graham* court *sub nom. Veal v. First American Sav. Bank,* 914 F.2d 909 (7th Cir.1990), it specifically did not rely on the lower court's resolution of the preemption question. In fact, the *Veal* court noted in dicta that, "if sued by a Lender in state court for collection of one of these loans, each of these plaintiff students would be entitled

to assert any defenses available under state law that are applicable to his or her particular loan." 914 F.2d at 914–15 n. 7. The court believes that the *Veal* court's dictum, which comports with the holdings of *Tipton* and *Jackson,* is correct: the HEA does not provide a blanket preemption of all state law. (The court addresses limited preemption in Part IV.B., below.)

Moreover, since the parties originally briefed this point, several courts have followed the *Tipton–Jackson I* line, including *Hernandez v. Alexander,* No. CV–S–91–705–PMP (D.Nev. May 19, 1992); *Shorter v. Alexander,* No. 1:92–CV–1021–rlv (N.D.Ga. Dec. 8, 1992); and *Hicks v. Alexander,* No. 1:92–CV–1059–GET (N.D.Ga. Jan. 20, 1993).

demonstrated that the application of *any* state regulation would dismantle the HEA.[23]

Finally, defendants are not persuasive when they argue that the *Clearfield Trust* doctrine, deriving from *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1974), applies to the HEA. Defendants assert that the court should find that the HEA requires a uniform, national rule regarding the discharge of debts in order to function. However, although the application of some local rules, which might differ from state to state, could upset the functioning of the HEA, those rules are addressed adequately—through partial preemption—below. There simply is no reason to dismiss all state law.

Therefore, the court finds that the HEA does not preempt all relevant state law— either explicitly or implicitly and that the *Clearfield Trust* doctrine does not apply.

B. *There is Limited Preemption of Local Law under the HEA.*

██ Although the HEA does not preempt all state and local law, it does, under the Supremacy Clause, preempt any state law with which it conflicts. This may happen in one of two ways. First, it may be impossible for an individual to abide by both the state law and the HEA; in that case, the HEA preempts the conflicting state law. Second, the state law may preclude execution of the purposes and objectives of the HEA; again, the impeding state law is preempted. *See Guerra*, 479 U.S. at 280, 107 S.Ct. at 689.

Plaintiff's third and fourth claims largely are based on the operation of state law. First, plaintiff asserts that she maintains her NBS-related claims and defenses against defendants because of D.C.Code § 28–3809, the D.C. law subjecting lenders of direct installment loans to all claims and defenses the purchaser has against the seller. She also argues that the claims survive under § 28–3807(b), which prohibits negotiable instruments. Finally, plaintiff asserts that these violations are willful, thus bringing into play

§ 28–3813(f). The court finds that each of these laws is preempted by the HEA.

1. Section 28–3807.

██ The court finds that section 28–3807 does not apply to GSLs. Moreover, even if it did apply, it would be preempted by the HEA.

Section 28–3807, the title of which is "Negotiable instruments prohibited," proscribes the use of "an *instrument,* except a check, payable 'to order' or 'to bearer' as evidence of the consumer obligation of the consumer." § 28–3807(a) (emphasis added).

Defendants' first argument, that NBS itself was not the actual lender, likely is unavailing under D.C. law. The statute (§ 28–3807) does not specifically limit itself to lender-financed circumstances. However, as with the *Howard* case discussed in Part III., above, it is unlikely that the D.C. courts would hold § 28–3807 applicable to this "supply-side" transaction.

Moreover, other arguments asserted by defendants are even more persuasive. First, although the text of the statute does not clearly proscribe negotiable instruments as such, its text does proscribe "instruments;" excludes one type of negotiable instrument (a check); and, refers to one of the most important aspects of the textbook definition of negotiable instrument (that it be payable "to order" or "to bearer").[24] These elements, when considered jointly with the title of the section (which is crystalline in its clarity), demonstrate that the statute is designed to prohibit negotiable instruments. However, the notes evidencing GSLs are not negotiable instruments. Although they may be payable "to order" or "to bearer," they are subject to a great number of regulations which prevent them from qualifying for negotiable instrument's "payable on demand" criterion. *See* D.C.Code § 28:3–104(1)(c). Thus, the court finds as a matter of law that § 28–3807 does not apply to GSLs.

However, even if the code provision did apply to GSLs, it would be preempted by the HEA. In order to provide sufficient funding

---

**23.** In fact, the HEA specifically looks to state law for a few limited purposes.

**24.** *See* D.C.Code § 28:3–104(1).

for the GSL program, it is necessary that the notes evidencing GSLs be transferrable (albeit only among those entities statutorily permitted to trade in GSLs). If § 28–3807 were to apply to the HEA, and thus prohibit making credit sales with notes easily transferrable among approved lenders, banks would be able to make GSLs only with their own funds, thus severely limiting the amount of capital available for the program and effectively crippling it. The application of § 28–3807, therefore, would frustrate the purposes behind the HEA to such an extent that it would have to be preempted. *See Jackson I*, 788 F.Supp. at 1255.

2. Section 28–3809.

 Section 28–3809(a) provides as follows:

A lender who makes a direct installment loan for the purposes of enabling a consumer to purchase goods or services is subject to all claims and defenses of the consumer against the seller arising out of the purchase of the goods or service if such lender acts at the express request of the seller, and—

(1) the seller participates in the preparation of the loan instruments, or

(2) the lender is a person or organization controlled by or under common control with the seller, or

(3) the seller receives or will receive a fee, compensation, or other consideration from the lender for arranging the loan.

§ 28–3809(a). Defendants argue first, that the prerequisite—that the lender act "at the request of the seller"—is not present here as a student loan is approved solely on the *borrower*'s application. Second, all defendants claim that § (a)(1) is preempted as conflicting with the purposes of the HEA. Third, HEAF and CSLFC/BA assert that § (a)(3) does not apply.

The court agrees with defendants' first argument and finds that the prerequisite is not met in this case. Although the *Jackson I* court found that plaintiffs' allegations met this hurdle, that case was significantly different from the case alleged here. The *Jackson I* court stated that it was "critical to distinguish between the [school's] forwarding an application, which is mandated by the HEA, and a transaction in which the school makes an 'express request' for the lender to make the loan in spite of the lender's considered business judgment to do otherwise." *Jackson I*, 788 F.Supp. at 1247. In *Jackson I*, plaintiffs had alleged that the lending banks had a business arrangement with the school, knew or had reason to know of the school's high default and withdrawal rates, and failed to exercise reasonable business judgment. *Ibid.* Allegations of this type are not present here.[25] In fact, plaintiff has not alleged that the lending bank—which is not a defendant to this action—acted improperly; plaintiff's allegations suggest merely that the bank entered into an origination relationship with NBS, a perfectly legal action under the HEA. And, plaintiff has not alleged that the bank made any loans that would have been—or were—contrary to the bank's considered judgment. Thus, the court concludes that the lender did not act "at the express request of the seller" as contemplated by the framers of the statute. Section 28–3809 does not apply.

Moreover, even if the court found that § 28–3809 applied, the statute would be preempted by the HEA on the facts alleged here. In the typical GSL transaction, the lender acts at the request of the student (based on the student's application). *See* 34 C.F.R. § 682.102(a). However, Congress has mandated that the school participate in the lending process first by certifying the application and then by forwarding it to a private lender. Moreover, if an origination relationship exists between the bank and the school,

**25.** Plaintiff does allege that "[t]he preparation of the loan application, specification of the type of loan, determination of the loan amount, preparation of the promissory note, selection of the lender, and presentation of the terms of the loan to plaintiff Armstrong was (sic) handled entirely by NBS." Complaint at 10, ¶ 28. As discussed immediately below, given the procedures of the

HEA, particularly the procedures applicable to those schools which have an origination relationship with a lender, these actions are typical of schools participating in the GSL program. The court therefore holds that such actions, mandated by the HEA, may not give rise to liability under § 28–3809(a).

the actions taken by the bank in this case are perfectly typical of those necessarily performed by eligible schools. In short, the application of § 28–3809 to the HEA would prevent schools from performing functions that clearly are contemplated by the HEA; it therefore must be preempted.

Plaintiff's failure to clear the hurdle presented by the § 28–3809(a) prerequisite makes further discussion of this section unnecessary; nonetheless, the court notes that two of the three subparts of § (a) also either are not present here or are preempted by the HEA. As to § (a)(1), the court finds that it is preempted by the HEA. *See Jackson I,* 788 F.Supp. at 1247. The HEA clearly contemplates that the school participate in the preparation of the relevant loan documents; moreover, as mentioned above, if an origination relationship exists, the school's participation is extensive. The functioning of the HEA would be limited severely if lenders faced liability for following the actions mandated by Congress; § (a)(1) therefore must be preempted.

As to § (a)(2), there is no allegation that NBS and the lender were under common control. Thus, this section is not relevant to the present case.[26]

### 3. Section 28–3813(f).

Section 28–3813(f) renders unenforceable any obligations premised on "conduct which can be shown to be in willful violation of the provisions of this chapter...." As the court has found that there is no liability under either of the two above statutes, there also cannot be a violation under § 28–3813(f). Therefore, plaintiff does not state a cause of action under this section.

### 4. Conclusion.

For the above reasons, the court finds that the various provisions of the D.C.Code cited by plaintiff are preempted by the HEA, do not apply, or both. They therefore cannot form the basis for plaintiff's claim that she

maintains alleged claims and defenses assertable against defendants.

### C. *The FTC Holder Rule Provides Plaintiff with no Relief.*

#### 1. Federal law.

■ The FTC Holder Rule, 16 C.F.R. § 433.2, requires that any consumer credit contract for the sale or lease of goods or services contain a notice provision that the holder of the contract is subject to claims and defenses the consumer might assert against the seller. No such notice was included in the GSL contract plaintiff signed. Thus, plaintiff asserts that the FTC Holder Rule applies to GSLs; that even though the rule was omitted, it may be implied into the GSL contract; and that D.C. law leads to a similar outcome.

The first question the court must address is whether the FTC Holder Rule even applies to GSLs. The Holder Rule is a regulation promulgated under the FTC Act, 15 U.S.C. § 41 *et seq.* It internally incorporates the definition of "credit sale" used by the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.,* and Regulation Z, 12 C.F.R. § 226, *et seq.* At the time the Holder Rule was promulgated in 1977, GSLs were within the scope of "credit sale." In 1982, however, Congress (and subsequently, the FTC) exempted student loans from the Truth in Lending Act and Regulation Z. *See* 15 U.S.C. § 1603(6) and 12 C.F.R. § 226.3(f). Given this uncertain history, recent court decisions have split as to whether the Holder Rule applies to GSLs.

On one hand is another member of this court, Judge Richey, who in *Jackson I,* 788 F.Supp. at 1249–51, determined that the Congressional amendment had no effect on the previously adopted definition. Opposing this view is the Seventh Circuit Court of Appeals in *Veal v. First American Sav. Bank,* 914 F.2d 909, 914 (7th Cir.1990).

The court finds that this debate largely is academic, however, as every court which has

---

**26.** As to § (a)(3), plaintiff has alleged that NBS received compensation from the lender. However, plaintiff's allegations are conclusory at best, and likely are not sufficient to survive defen-

dants' motion to dismiss. Since the court determines that § 28–3809 does not apply, the court will not further address plaintiff's allegations under § (a)(3).

found the FTC rule applicable has immediately thereafter held that it nonetheless provides plaintiff with no basis for relief. First, as the *Jackson I* court noted, 788 F.Supp. at 1251, violation of the Holder Rule does not furnish private parties with a cause of action. *See Holloway v. Bristol–Meyers Corp.*, 485 F.2d 986 (D.C.Cir.1973). Therefore, the court does not have the power, absent intervention by the FTC, to grant plaintiff the relief she seeks.

Notwithstanding this, plaintiff then asks the court to imply the Holder Rule's notice into the GSL contract. However, even if the court were to hold that the notice impliedly was part of the contract, the court would have no more power to grant plaintiff relief then it would have if the parties had explicitly included the notice (again, absent action by the Federal Trade Commission). *Jackson I*, 788 F.Supp. at 1251.

Plaintiff next states that the purposes behind the rule would be circumvented unless private debtors maintain their claims and defenses against lenders even in the absence of the Holder Rule. However, the Holder Rule's notice provision is a contractual term; it provides the debtor with certain, limited contractual rights. If the notice is not included in the contract, therefore, the rights created by the notice cannot exist. Thus, as the Holder Rule's notice was not included in plaintiff's GSL contract, plaintiff has no right to enforce its terms. *See Vietnam Veterans of America v. Guerdon Industries, Inc.*, 644 F.Supp. 951, 964–65 (D.Del.1986); *Jackson I*, 788 F.Supp. at 1251.[27]

Therefore, regardless of whether the Holder Rule applies to GSLs; and regardless of whether the court implies the notice into the GSL contract, the court finds that the FTC Holder Rule affords plaintiff with no basis

for asserting her claims and defenses against defendants.

**2. D.C. law.**

However, even if the court finds that plaintiff has no claim under federal law, plaintiff asserts that the failure to include the notice of defenses constitutes an unfair trade practice in violation of D.C.Code § 28–3904 and violates 16 D.C. Municipal Regulations § 1212.1.

The relevant portions of § 28–3904 state as follows:

> It shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to:
>
> . . . . .
>
> (r) make or enforce unconscionable terms or provisions of sales or leases;
>
> . . . . .
>
> (x) sell consumer goods in a condition or manner not consistent with that warranted ... by operation or requirement of federal law;
>
> . . . . .
>
> (dd) violate any provision of title 16 of the District of Columbia Municipal Regulations.

The court finds that none of these provisions provides plaintiff with a cause of action.

 *First*, the court holds as a matter of law that the absence of the holder notice is not unconscionable.[28] To establish unconscionability, plaintiff "must prove not only that one of the parties lacked a meaningful choice but also that the terms of the contract are unreasonably favorable to the other party." *Riggs Nat'l Bank of Washington, D.C. v. District of Columbia*, 581 A.2d 1229, 1251 (D.C.App.1990) (citing *Williams v. Walker–*

---

**27.** Other cases reaching similar conclusions include *Hernandez v. Alexander*, No. CV–S–91–705–PMP (D.Nev. May 19, 1992), slip. op. at 20, 25 (following *Jackson I*); and *Shorter v. Alexander*, No. 1:92–CV–1021–rlv (N.D.Ga. Dec. 8, 1992), slip op. at 21 (*same*).

**28.** The court notes that Judge Richey in *Jackson I* denied defendants' motion to dismiss plaintiffs' claim brought under § 28–3904 and based on the

absence of the FTC notice provision in the GSL contract. 788 F.Supp. at 1253. Subsequently, however, Judge Richey granted defendants' motions for summary judgment on the same claim, holding that plaintiffs had "failed to meet their burden of showing that there is a genuine dispute as to whether the terms of the note unreasonably favored the Defendants." *Jackson v. Culinary School of Washington*, 811 F.Supp. 714, 724 (D.D.C.1993) ("*Jackson II*").

*Thomas Furniture Co.*, 121 U.S.App.D.C. 315, 319, 350 F.2d 445, 449 (1965)). Here, there may be a question as to whether plaintiff lacked meaningful choice; thus, one half of plaintiff's burden survives the motion to dismiss stage. However, the other half of the burden is not—and cannot be—met. Although it is undisputed that the contract did not include the holder notice, an omission which normally constitutes an unfair trade practice under the FTC Holder Rule, there is a far cry between this potential unfairness and unconscionability. This is a situation where the Federal Government itself, through the Secretary of the Department of Education, has approved the loan contract at issue (and therefore also approved the omission of holder notice). And, the absence of the holder rule certainly does not meet the typical example of an unconscionable contract term. *See Walker–Thomas.* Thus, the court holds, as a matter of law, that the absence of the holder rule is not unreasonably favorable to any party, and therefore is not unconscionable. Plaintiff has no cause of action under § 28–3904(r).[29]

■ *Second,* Judge Richey decided in *Jackson II* that § 28–3904 does not apply to GSL contracts, which are used for "services," not "goods" (as required by § 28–3904(x)). 811 F.Supp. at 724–25. The court finds Judge Richey's argument persuasive, and adopts it here. Thus, plaintiff fails to state a cause of action under § 28–3904(x).

■ *Third,* the court finds that plaintiff has failed to state a claim under the D.C. Municipal Regulations. Title 16, section 1212.1 provides as follows:

A school shall not use any contract provision . . . to deny or abridge the benefits of any applicable Federal or District law intended to protect consumers or credit purchasers.

Based on the allegations in this case, in which it is undisputed that the *lender* provided the GSL contract, there are no allegations which support a conclusion that the *school* acted in violation of this section. This section provides rights and defenses when a *school* sues as plaintiff or is sued as defendant on its own contracts; neither condition exists here. Thus, plaintiff has no claim under § 1212.1, and defendants' motions must be dismissed as to this point. *See Jackson I*, 788 F.Supp. at 1256.[30]

3. Conclusion.

It is undisputed that the FTC Holder Rule notice was not included in plaintiff's GSL contract. However, the court finds that, even if the FTC Holder Rule applies to GSLs, it does not give plaintiff a private right of action. In addition, the omission does not give plaintiff a right of action under either provision of D.C. law to which plaintiff points, § 28–3904 and D.C.M.R. § 1212.1. *See* Complaint 29, ¶ 90.

Therefore, plaintiff's third and fourth claims for relief, to the extent they are based on the Holder Rule, are dismissed.

D. *Origination.*

■ Finally, plaintiff asserts that her claims and defenses survive because of an origination relationship between the school and the initial lender. *See* 34 C.F.R. § 682.-200.

The Secretary has not moved to dismiss any claims based on this origination relationship. Rather, the Secretary, in his motion to dismiss, acknowledges that

where there is an origination relationship between the school and the lender, the

---

**29.** It is also not clear that the *omission* of a contract term is actionable under § 28–3904(r), which specifically speaks of the *inclusion* of "unconscionable terms or provisions." In *Jackson I*, Judge Richey rejected defendants' argument that "unconscionability cannot rest upon an assertion that an additional term . . . should have been included in the contract." 788 F.Supp. at 1253. However, plaintiff gives no support for her argument that an omission of a term that would cure some defect is tantamount to the inclusion of an unconscionable term for purposes of § 28–

3904(r). Indeed, the two concepts are neither identical nor interchangeable, as plaintiff would have the court believe.

**30.** Thus, plaintiff also fails to state a claim under § 28–3904(dd), which requires a violation of title 16 of the D.C. Municipal Regulations. In any event, as § (dd) was enacted into law in 1990, *see* D.C. Act 8–317 (Dec. 27, 1990), two years *after* the incidents here in question, it provides no basis for relief.

student's claims and defenses as to the school can be asserted as defenses to the loan contract, whether rights under the loan contract are being asserted by the lending bank, the guaranty agency, or the Secretary.

Secretary's Motion to Dismiss at 32. Therefore, pursuant to this acknowledgement, plaintiff's cause of action as to this point survives this stage of the proceedings.[31]

However, the court cannot accept plaintiff's assertion, joined by the Secretary, that the Secretary's policy also binds the other defendants. The Secretary's position is not codified either in a statute or in a regulation; rather, it is merely a *policy* of the Department of Education. Such a policy is not binding on third parties, and plaintiff does not gain the right to assert defenses against defendants solely because the Secretary, in an unofficial policy, so states. *See Jackson I,* 788 F.Supp. at 1261–63; *Tipton,* 768 F.Supp. at 566–70; *Veal,* 914 F.2d at 914. Accordingly, all claims based on an origination theory are dismissed as to defendants CSLFC/BA, and HEAF.

## V. *CONCLUSION.*

In this action, plaintiff is attempting to abrogate her responsibilities under her guaranteed student loan because she did not like the education she received. It may be that NBS did not provide an adequate education; however, if that is the case, the proper defendant is not a current holder or guaranty of the loan, but the party which breached the only contract really relevant to plaintiff's injury: NBS, which failed to perform its role under the enrollment contract it had with plaintiff.

Plaintiff argues that the purpose of the HEA is to benefit students, and the court acknowledges that, to a certain degree, plaintiff is correct. However, money will not be made available for loans if students are able to avoid repaying their student loans by raising every possible defense they might have against the school under state or local law. If the court were allowed such defenses, those who provide the funding for student loans would refrain from sponsoring student loans, and the end result is that the program will fail. What plaintiff must realize is that the goal of the student loan program—that students receive loans and, thereby, educations—is achievable *only* if the lending and legal environment is such that lenders are willing to participate in the GSL process.

The defendants in this case, for the most part, have not been accused of—and have not committed—any wrongdoing;[32] rather, they have followed the HEA statutes and regulations. The court finds that the federal, state, and common laws at issue do not allow plaintiff, who had the most direct and most extensive dealings with NBS of all parties to this suit, to abrogate her obligations and leave defendants liable for the errors of NBS (or, for that matter, of plaintiff herself). The court will not shift the burden of responsibility for breaches of plaintiff's enrollment contract to these third-party defendants.

Accordingly, the motions to dismiss are granted in whole or in part. The first claim for relief, to the extent it is based on D.C. law, is dismissed against defendant ACCET. The second, third, and fourth claims are dismissed as to defendants CSLFC/BA and HEAF. And, the case is dismissed as to the Secretary as to the second claim for relief in its entirety; and as to the third and fourth claims for relief as to all claims except those founded on the alleged origination relationship between NBS and First Independent Trust Company.

### *ORDER*

This case comes before the court on each defendant's motion to dismiss the complaint, as well as several other related motions.

---

**31.** Plaintiff's remedies against the Secretary are limited by statute:

no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Secretary or property under the Secretary's control....

20 U.S.C. § 1082(a)(2). The court will not address how this section will affect the remedies available to plaintiff until the issue has been briefed properly by the remaining parties.

**32.** And, as the court noted above, any allegations of wrongdoing on the part of these defendants are vague and conclusory at best.

Upon consideration of the filings of counsel and the relevant law, and for the reasons stated in the accompanying Memorandum Opinion, it is hereby ORDERED that:

1. The motion to dismiss filed by defendant Accrediting Council for Continuing Education & Training, Inc. ("ACCET"), on February 10, 1992, is GRANTED in part; the first claim for relief, to the extent it is based on the D.C. Consumer Protection Procedures Act, is DISMISSED. ACCET's motion to dismiss the common law fraud and misrepresentation claim is DENIED, but plaintiff shall file an amended complaint setting forth that claim separately. ACCET need not respond to the present complaint; it shall respond to the amended complaint within 10 days after it is filed.

2. The motion to dismiss filed by defendant Higher Education Assistance Foundation ("HEAF") on February 10, 1992, is GRANTED; the second, third, and fourth claims for relief are DISMISSED as to HEAF.

3. The motion to dismiss filed by defendants Bank of America NT & SA and California Student Loan Finance Corporation (collectively "CSLFC/BA") on March 2, 1992, is GRANTED; the second, third, and fourth claims for relief are DISMISSED as to these defendants.

4. The motion to dismiss filed by defendant Secretary of Education ("the Secretary") on March 3, 1992, is GRANTED; the second claim for relief is DISMISSED and the third and fourth claims for relief are DISMISSED (with the exception of any claims based on the alleged origination relationship between NBS Automotive School and First Independent Trust Company).[1]

5. Plaintiff shall, within 30 days of this date, file an amended complaint that conforms to this order and accompanying memorandum opinion.

6. The Secretary's unopposed motion for enlargement of time within which to file an answer, filed March 3, 1992, is GRANTED; the Secretary shall file an answer to the amended complaint within ten days of the filing of the amended complaint.

7. Plaintiff's motion to file a surreply, filed June 3, 1992, is GRANTED, *nunc pro tunc.*

8. Plaintiff's unopposed motion for extension of time, filed March 27, 1992, is GRANTED *nunc pro tunc.*

9. CSLFC/BA's unopposed motion for extension of time, filed May 8, 1992, is GRANTED *nunc pro tunc.*

10. The Secretary's motion for further enlargement of time on consent, filed May 8, 1992, is GRANTED *nunc pro tunc.*

11. HEAF's motion for protective order, filed February 20, 1992, is DENIED AS MOOT.

12. The Secretary's motion for protective order, filed March 13, 1992, is DENIED AS MOOT.

13. CSLFC/BA's motion for protective order, filed March 19, 1992, is DENIED AS MOOT.

14. Plaintiff's motion for extension of time to file motion for class certification filed March 5, 1992, is GRANTED; plaintiff shall file such motion within thirty days of this date or within such further time as shall be granted by the court upon proper written motion.

SO ORDERED.

---

1. The Secretary did not move to dismiss the claims based on this relationship.